IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION

No. 2:10-CV-00037-D

| | | |
|---|---|---|
| JACQUELINE VERNETTE BROOKS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on the parties' cross motions for judgment on the pleadings.

Claimant, Jacqueline Vernette Brooks, seeks judicial review of the Commissioner's denial of her

application for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security

Income ("SSI"). After a thorough review of the record and consideration of the briefs submitted by

counsel, it is recommended that Claimant's Motion for Judgment on the Pleadings [DE-27] be

granted, that the Commissioner's Motion for Judgment on the Pleadings [DE-29] be denied, and that

the case be remanded to the Commissioner for further proceedings consistent with this Memorandum

and Recommendation.

## STATEMENT OF THE CASE

Claimant protectively filed an initial application for DIB and SSI benefits on May 25, 2007.

(R. 12, 130-144, 155.)  She alleged disability beginning June 1, 2006 due to problems with her feet,

body rash, back problems, a screw in her left ankle, and a knot on her collar bone.  (R. 155, 160.)

This application was denied initially (R. 71-76) and upon reconsideration (R. 81-98).  Claimant then

requested a hearing before an Administrative Law Judge ("ALJ") (R. 99-100), which took place on August 10, 2009 (R. 27-66). On September 23, 2009, the ALJ issued a decision denying Claimant's application in its entirety. (R. 9-22.) The Appeals Council ("the Council") denied Claimant's request for review on July 9, 2010 (R. 1-3), which rendered the ALJ's decision a "final decision" for purposes of judicial review. *See Walls v. Barnhart*, 296 F.3d 287, 289 (4th Cir. 2002) (noting that when the Council denies a request for review, the underlying decision by the ALJ becomes the agency's final decision for purposes of appeal). On August 2, 2010, Claimant timely commenced this action pursuant to 42 U.S.C. § 405(g).

## DISCUSSION

### I. Standard of review

The scope of judicial review of a final decision regarding disability benefits under the Social Security Act is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *Walls*, 296 F.3d at 290; 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). This Court must not weigh the evidence, as it lacks the authority to substitute its judgment for that of the Commissioner. *Walls*, 296 F.3d at 290. Thus, in determining whether substantial evidence supports the Commissioner's decision, the Court's review is limited to whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his or her findings and rationale in crediting the evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

## II. The Social Security framework

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process to be followed in a disability case. 20 C.F.R. §§ 404.1520, 416.920. At step one, if the claimant is currently engaged in substantial gainful activity, the claim is denied. If the claimant is not engaged in substantial gainful activity, then at step two the Commissioner must determine whether the claimant has a severe impairment or combination of impairments which significantly limit his or her ability to perform basic work activities. If no severe impairment is found, the claim is denied. If the claimant has a severe impairment, at step three the Commissioner determines whether the claimant's impairment meets or medically equals the requirements of one of the Listings of Impairments ("Listings"), as listed in 20 C.F.R. § 404, Subpart P, App. 1. If the impairment meets or equals a Listing, the person is disabled *per se*. If the impairment does not meet or equal a Listing, at step four the claimant's Residual Functional Capacity ("RFC") is assessed to determine if the claimant can perform his or her past work despite the impairment. If so, the claim is denied. If the claimant cannot perform his or her past relevant work, at step five the burden shifts to the Commissioner to show that the claimant, based on his or her age, education, work experience and RFC, can perform other substantial gainful work.

## III. The ALJ's findings

Here, the ALJ proceeded through the five-step sequential evaluation process as set forth in 20 C.F.R. §§ 404.1520, 416.920. First, at step one, the ALJ found that Claimant had not engaged in substantial gainful activity since June 1, 2006, the alleged onset date. (R. 14.) Next, at step two, the ALJ found that Claimant suffered from the severe impairments of borderline intellectual functioning, residuals from a fracture of the left ankle, chronic right ear infections, psoriasis, and

3

chronic back pain. *Id.* However, at step three the ALJ determined that Claimant's impairments did not meet or medically equal a Listing. (R. 15-16.) Instead, at step four, the ALJ determined that Claimant retained the RFC to perform light work with postural, environmental, and mental restrictions, though the ALJ did find that Claimant was unable to perform past relevant work. (R. 16-20.) Finally, at step five, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Claimant could perform. (R. 21.) As a result, the ALJ found that Claimant was not disabled. (R. 21-22.)

IV. **The August 10, 2009 administrative hearing**

A. **Claimant's testimony at the administrative hearing**

Claimant testified to the following at the August 10, 2009 administrative hearing held in conjunction with her application for DIB and SSI benefits. (R. 29-53.) At the time of the hearing, she was 45 years old, unmarried, and not living with any young children. (R. 33.) She had a ninth grade education and was able to read and do "some" simple math. (R. 33-34.) Before dropping out of school, Claimant had been enrolled in special education classes in which she made mostly Cs, Ds, and Fs. (R. 49-50.) Later in life, Claimant had gone back to school to obtain her GED, but was not successful. (R. 33-34.)

Claimant's last employment had been at a Golden Corral Restaurant, where she cooked at the hot bar for four hours a day from 2003 to 2006. (R. 34-35.) From 1999 to 2004, Claimant worked off and on as a part-time aide for home care agencies, and from 1997 to 1999, she worked full-time in maintenance for the housing authority. (R. 36.) While at the housing authority, she cut grass, did weeding, and painted. *Id.* In the past, Claimant also had held full-time jobs as a housekeeper at a Hampton Inn and as a cook in a nursing home for approximately six months each.

4

(R. 35-36.) Claimant also testified that she had briefly worked for Perdue Farms as a chicken packer in 2000. (R. 52.)

Claimant testified that she had left her last job on June 1, 2006 because she "was having problems with psoriasis and chemicals." (R. 37.) The psoriasis had been going on for a couple of years and caused burning that was not helped by the application of topical creams. (R. 37-38.) The condition had worsened since Claimant had stopped working. (R. 47.) Claimant also testified that she experienced daily swelling and pain in her left ankle stemming from a past break and a resulting surgery. (R. 38-39.) She was able to gain some relief from this pain by propping up the affected foot and taking Tylenol. (R. 40.) In addition, Claimant suffered from daily back pain as the result of a car accident. (R. 41-42.) As a result, she was unable to sit for more than 15-20 minutes at a time, walk long distances, sometimes had trouble standing for more than 15-20 minutes, and experienced pressure on her spine if she lifted more than 5-10 pounds. (R. 42-43.)

On a typical day, Claimant would get up, brush her teeth, cook breakfast, and then watch TV and sleep for the rest of the day. (R. 43.) Her daughter had recently moved in with her and did a lot of the chores, though Claimant was able to drive a car and attended church. (R. 33, 43-44.) Claimant had been living in public housing for about 13 years, was on food stamps, and her daughter helped out with the other bills. (R. 44-45.)

### B.     Vocational expert's testimony at the administrative hearing

Paula Day, a vocational expert ("VE"), also testified at the administrative hearing. (R. 53-63.) Ms. Day stated that Claimant had performed the following past work: (1) cook at Golden Corral, DOT code 313.361-014, medium physical requirements, skilled (job specific, not transferable), SVP 7; (2) cook at nursing home, DOT code 315.361-010, medium physical

5

requirements, skilled (job specific, not transferable), SVP 6; (3) motel cleaner, DOT code 323.687-014, light physical requirements, unskilled, SVP 2; and (4) work for the housing authority and maintenance, DOT code 382.664-010, medium physical requirements, semi-skilled, SVP 3. (R. 58.) The ALJ then posed the following hypothetical to Ms. Day:

> Assume the existence of an individual who is 45 years old, thus is considered to be a younger individual, and has a ninth grade education, previous past work as described. Assume further, this individual has the Residual Functional Capacity to perform medium work, lifting up to fifty pounds, occasionally, twenty pounds frequently. Standing or walking six hours total in an eight-hour day, with sitting up to six hours in an eight-hour day. The work should be simple, routine in nature, and avoid concentrated exposure to cold and heat. Would they be able to do any of their past work?

(R. 58-59.) Ms. Day responded that, regarding Claimant's past relevant work, "those limitations would not preclude work as a motel cleaner" but would preclude the other past jobs "because of the heat restrictions with the cooking and the heat and cold restrictions with the maintenance." (R. 59.) The ALJ next asked Ms. Day whether adding a limitation that the person should avoid concentrated exposure to chemicals would eliminate all the past relevant work, to which Ms. Day responded that it would. *Id.*

The ALJ then asked Ms. Day whether there would be any other jobs that the person could perform, given all the discussed limitations. *Id.* Ms. Day responded that there would be, and gave three examples of jobs classified as medium physical requirements, unskilled, SVP 2: (1) dining room attendant, DOT code 311.677-018, approximately 218,000 similar jobs nationally and 5,500 in North Carolina; (2) hand packager, DOT code 920.587-018, approximately 1,000,000 similar jobs nationally and 23,000 in North Carolina; and (3) bartender helper, DOT code 312.687-010, approximately 109,000 similar jobs nationally and 3,000 in North Carolina. *Id.* The ALJ also asked

6

Ms. Day whether adding a limitation that there be only occasional climbing of ladders, ropes and scaffolds would change her testimony, to which Ms. Day responded that it would not.  *Id.*

The ALJ next posed the following additional scenario to Ms. Day: "And if I were to lower the lifting requirements to light work, 20 pounds occasionally, but 10 pounds frequently, with a sit/stand option, would there be any jobs?"  *Id.*  Ms. Day responded that there would be, and gave three examples of jobs classified as light physical requirements, unskilled, SVP 2: (1) office helper, DOT code 239.567-010, approximately 150,000 similar jobs nationally and 4,000 in North Carolina; (2) order caller, DOT code 209.667-014, approximately 22,000 similar jobs nationally and 1,000 in North Carolina; and (3) warehouse checker, DOT code 222.687-010, approximately 42,000 similar jobs nationally and 1,000 in North Carolina.  (R. 59-60.)

## IV.    Claimant's arguments

On appeal, Claimant alleges the following errors by the ALJ: (1) error in finding that Claimant did not meet or equal Listing 12.05C; (2) failure to specify in the hypothetical question that Claimant required an "at will" sit/stand option; and (3) improper reliance on VE testimony that was in unexplained conflict with the Dictionary of Occupational Titles ("DOT").  Each argument will be addressed in turn.

### A.    Claimant's argument that the ALJ erred in finding that she did not meet or equal Listing 12.05C.

Listing 12.05 provides that a claimant is disabled if (s)he suffers from "mental retardation." 20 C.F.R. § 404, Subpart P, App. 1, §12.05.  Specifically, Listing 12.05 states that:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age

22. The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied:

A. Mental incapacity evidenced by dependence on others for personal needs (e.g., toileting, eating, dressing, or bathing) and an inability to follow directions, such that the use of standardized measures of functioning is precluded; or

B. A valid verbal, performance, or full scale IQ of 59 or less; or

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; or

D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

   1. Marked restriction of activities of daily living; or
   2. Marked difficulties in maintaining social functioning; or
   3. Marked difficulties in maintaining concentration, persistence or pace;
   4. Repeated episodes of decompensation, each of extended duration.

*Id.* Therefore, Listing 12.05C sets forth a two-part inquiry for determining mental retardation. First, a claimant must satisfy the diagnostic definition of mental retardation by showing that (s)he suffers from "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period." Then, the claimant must meet the category C level of severity by showing that (s)he has a valid IQ of 60-70 *and* a "physical or another mental impairment imposing an additional and significant work-related limitation of function." *See Norris v. Astrue*, No. 7:07-CV-00184-FL, 2008 WL 4911794, at *2-3 (E.D.N.C. Nov. 14, 2008).

Here, Claimant argues that the ALJ erred in concluding that she failed to meet or medically equal Listing 12.05C. In support of her argument, Claimant contends that (1) she satisfied the diagnostic definition by showing deficits in adaptive functioning initially manifested during the developmental period because she "struggle[d] through special education classes and then drop[ped]

8

out in the 9th grade after becoming pregnant," and that (2) she met the category C level of severity because she has a full scale IQ of 63 and her other severe impairments recognized by the ALJ constituted a "physical . . . impairment imposing an additional significant work-related function." Cl.'s Mem. in Supp. of Mot. for J. on the Pleadings at 3-4 [DE-28] (hereinafter "Cl.'s Mem."). In response, the Commissioner argues only that the ALJ was correct in concluding that Claimant did not satisfy the diagnostic definition. Mem. in Supp. of the Comm.'s Mot. for J. on the Pleadings at 11-12 [DE-30] (hereinafter "Comm.'s Mem.").

At the outset, the Court finds that it is undisputed that Claimant has shown an IQ between 60-70 and that Claimant has additional severe impairments which constitute a physical impairment imposing an additional significant work-related limitation of function.[1] Therefore, Claimant has clearly met both prongs of the category C level of severity. However, "even if the record clearly establishes that the plaintiff meets the [level of severity] requirements of section 12.05(C), a finding of mental retardation cannot be warranted without a finding that the plaintiff manifested deficits in adaptive functioning before age 22." *Thompson v. Astrue*, No. 2:07-CV-00038-FL, 2009 WL 21510, at *2 (E.D.N.C. Jan. 2, 2009) (quoting *Justice v. Barnhart*, 431 F. Supp. 2d 617, 619 (W.D.Va. 2006)). Accordingly, the Court turns its attention to the question of whether the ALJ's finding that Claimant has not satisfied the diagnostic definition of mental retardation by showing that she suffers

---

[1] The Commissioner concedes that Claimant was found to have a full scale IQ score of 63 in 2007, Comm.'s Mem. at 4, 11-12, and the record clearly indicates that the ALJ found that Claimant suffered from the additional severe impairments of residuals from a fracture of the left ankle, chronic right ear infections, psoriasis, and chronic back pain (R. 14). An ALJ's finding of additional severe impairments at step two of the sequential evaluation process constitutes sufficient evidence of impairments which impose an additional significant work-related limitation of function for purposes of Listing 12.05. *Luckey v. Dep't of Health and Human Servs.*, 890 F.2d 666, 669 (4th Cir. 1989).

9

from deficits in adaptive functioning initially manifested during the developmental period is supported by substantial evidence.

The ALJ in this case found at step two of the sequential evaluation process that Claimant suffered from the severe impairment of borderline intellectual functioning based on psychometric testing. (R. 14.) However, the ALJ found that Claimant had *not* established that her borderline intellectual functioning constituted an impairment that would meet or equal a Listing. (R. 15.) In so doing, the ALJ specifically considered Listing 12.05, and concluded that Claimant had not satisfied the diagnostic definition of mental retardation.[2] Rather, the ALJ found that, "[a]lthough [Claimant] has a low IQ, her history does not reveal that she had deficits in adaptive functioning initially manifested during the developmental period as required." *Id.* In support of this conclusion, the ALJ pointed to the facts that Claimant had left school because she was pregnant, was "able to raise her child to adulthood independently," was "able to work at jobs that are defined as skilled and semi-skilled," was able to read and write, was able to "seek medical treatment when needed and ha[d] been able to give her treating and examining sources a detailed medical history," and had been able to follow prescribed treatments. *Id.*

On appeal, Claimant argues that she had in fact satisfied the diagnostic definition of Listing 12.05 because "she was in special education class, and even then, received mostly "D"s and "F"s [on] her report cards[,] [w]hen [she] was 9 years old chronologically, she was only 6 mentally[,] [and] it is difficult to think of anything more *mal*adaptive than to become pregnant in the 9th grade."

_____

[2] Since the ALJ found that Claimant had not satisfied the diagnostic definition of mental retardation, she did not reach the issue of whether Claimant had satisfied the A, B, C, or D level of severity criteria. However, as previously mentioned, the Court finds that the category C level of severity criteria would be clearly satisfied in this case.

Cl.'s Mem. at 3. In addition, Claimant argues that the ALJ erred by failing to even mention her history of poor performance in special education classes, her chronological/mental age disparity, or the fact that when she later attempted to obtain a GED, she did not succeed. *Id.* at 3-4.

In response, the Commissioner argues that the ALJ did in fact point to evidence which shows that Claimant did not satisfy the diagnostic definition of mental retardation, and lists some of the facts mentioned by the ALJ in her decision. In addition, the Commissioner argues that "although she attended special education classes, [Claimant] left school due to her pregnancy," and that "[w]hile getting pregnant at such a young age is, undoubtedly, irresponsible, it is hardly reflective of mental retardation." Comm.'s Mem. at 12-14. The Commissioner also notes that Claimant's claim that she suffers from a chronological/mental age disparity is unsupported by her citations to the record. *Id.* at 14.

In determining whether substantial evidence supports the Commissioner's decision, the Court's review is limited to whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and rationale in crediting the evidence. *See Sterling Smokeless Coal Co.*, 131 F.3d at 439-40. In this case, the Court finds that the ALJ did *not* properly analyze all of the relevant evidence or explain the rationale behind her conclusion that Claimant had not satisfied the diagnostic definition of mental retardation. Therefore, the Court finds that the ALJ's decision is not supported by substantial evidence and that the case should be remanded in order to allow the Commissioner to properly address whether Claimant has satisfied the diagnostic definition of mental retardation, as required by Listing 12.05C.

First, the Court has considered Claimant's argument that the ALJ erred by failing to mention several points of evidence in the record. While Claimant is correct that the ALJ did not mention her

unsuccessful attempts to obtain a GED despite the presence of such evidence in the record (R. 33-34), the Commissioner is correct that Claimant's citations to the record do not bear out her assertion that she suffered from a chronological/mental age disparity.[3]  However, the Court finds most significant the fact that the ALJ failed to properly consider Claimant's history of poor performance in special education.

Throughout her schooling, Claimant was enrolled in special education classes and earned mostly Cs, Ds, and Fs in them.  (R. 49-51.)  The ALJ completely failed to mention Claimant's history of poor performance in special education during her discussion of whether Claimant met Listing 12.05.  She did briefly mention it during her discussion of Claimant's *current* RFC, but the Court is unable to determine whether she considered it as part of her determination as to whether Claimant had deficits in adaptive functioning initially manifesting before age 22.  This Court has frequently found a history of special education, in conjunction with other factors, to be persuasive evidence of such deficits.  *See, e.g.*, *White v. Astrue*, No. 2:10-CV-00001-BO, 2010 WL 5173598, at *3 (E.D.N.C. Dec. 13, 2010); *Wynne ex rel. Pennell v. Astrue*, No. 5:09-CV-00367-FL, 2010 WL 2402843, at *5 (E.D.N.C. May 21, 2010) (M&R adopted by 2010 WL 2402849); *Radford v. Astrue*, No. 5:08-CV-00421-FL, 2009 WL 1675958, at *5-6 (E.D.N.C. Jun. 10, 2009).  Therefore, the Court finds that the ALJ erred by failing to properly analyze the relevant evidence of Claimant's history of poor performance in special education.

Similarly, in considering another Listing, Listing 12.02, the ALJ found that Claimant currently had mild restrictions on daily living, moderate difficulties in social functioning, and

---

[3] The Court has been unable to find independent evidence in the record of this alleged condition.

12

moderate difficulties in concentration, persistence, or pace. (R. 15.) If the ALJ had determined that any of these difficulties were caused by deficits in adaptive functioning which manifested before age 22, they could have, particularly in combination with Claimant's history of poor performance in special education, constituted sufficient evidence to satisfy the diagnostic definition of mental retardation.[4] However, the ALJ failed to discuss Claimant's difficulties with daily living, social functioning, or concentration, persistence or pace in the context of Listing 12.05. Therefore, the Court finds that the ALJ did not properly analyze what appears to be the potential existence of relevant evidence indicating that Claimant suffered from deficits in adaptive functioning in addition to her poor performance in special education.

Next, the Court is troubled by the ALJ's failure to properly analyze the results of a psychological examination present in the record. In assessing Claimant's RFC, the ALJ stated that "[t]he claimant is diagnosed with borderline intellectual functioning based on psychometric testing performed by Gregory Michael, D.Ed. on June 28, 2007." (R. 17.) The ALJ also mentioned several positive observations from Dr. Michael's report, including the facts that Claimant was appropriately

---

[4] Listing 12.05 does not define "adaptive functioning," so courts are free to use definitions promulgated by leading professional organizations. *See, e.g.*, *Wynne ex rel. Pennell*, 2010 WL 2402843, at *4 n.2, n.3. For example, under the Diagnostic and Statistical Manual of Mental Disorders ("DSM-1V"), to be deemed "mentally retarded" a claimant must have "significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *Atkins v. Virginia*, 536 U.S. 304, 309 n.3 (2002) (citing Am. Psychiatric Ass'n, Diagnostic and Stat. Man. Of Mental Disorders 39 (4th ed. 2000)). This Court has periodically considered these factors in assessing whether a claimant has satisfied the diagnostic definition of mental retardation. *See, e.g.*, *Wynne ex rel. Pennell*, 2010 WL 2402843, at *4; *Thompson*, 2009 WL 21510, at *3. Under this definition, Claimant's history of poor performance in special education likely constitutes a limitation in the skill area of functional academic skills which, in combination with another limitation, could satisfy the diagnostic definition.

dressed, well-groomed, understandable, able to read and write a little, able to concentrate, responsive and cooperative, and not easily frustrated or distracted. *Id.* However, it appears to the Court that the ALJ did not fully consider Dr. Michael's report. Notably, Dr. Michael did *not* opine that Claimant suffered from borderline intellectual functioning, as the ALJ suggests, and instead actually characterized Claimant as "functioning within the *mildly retarded range* of intellectual abilities." (R. 317) (emphasis added). The ALJ completely failed to mention this critical piece of evidence anywhere in her decision. In addition, the ALJ failed to mention the negative observations contained in Dr. Michael's report, including the facts that Claimant was only able to "marginally comply with instructions for projective testing," that "[h]er responses centered on current happenings and reactions without considerations of planning or consequences," and that "[e]motional content provided was minimal and she had difficulty developing endings even with questioning." *Id.* "[An] ALJ may not ignore or omit from discussion evidence that inconveniently fails to support [her] view of the case . . . [and] [a] finding cannot be said to be supported by substantial evidence if it is based upon material misstatements or omissions of evidence that weigh against the ALJ's finding." *White*, 2010 WL 5173598, at *3 (citing *Hines v. Barnhart*, 453 F.3d 559, 566 (4th Cir. 2006)). Therefore, the Court cannot say with certainty that the ALJ properly analyzed all of the relevant evidence contained in Dr. Michael's report.

Next, the Court notes that the ALJ may have relied on inappropriate facts in support of her conclusion that Claimant did not meet Listing 12.05. The ALJ reasoned that Claimant did not suffer from deficits in adaptive functioning because she, despite her low IQ, was able to raise a child, work at skilled/semi-skilled jobs, and seek medical treatment. (R. 15.) The ALJ was correct to reason that a low IQ alone does not prove manifestation of deficits in adaptive functioning before age 22 and

14

thus does not satisfy the diagnostic definition of mental retardation. *See, e.g.*, *Edge v. Astrue*, 627 F. Supp. 2d 609, 618-19 (E.D.N.C. 2008). However, "the fact an individual is able to work, complete household chores, and raise a family is not inconsistent with mild mental retardation." *Radford*, 2009 WL 1675958, at *6. In fact, for example, "Listing 12.05(C) assume[s] many, if not most, mildly mentally retarded individuals will be able to work . . unless [such an individual] has, or until [s]he develops, a severe physical or additional mental impairment." *Id.* (quoting *Muntzert v. Astrue*, 502 F. Supp. 2d 1148, 1158 (D. Kan. 2007)). Therefore, because the ALJ relied almost exclusively on the fact that Claimant had worked and performed other tasks in the past in finding that she did not meet Listing 12.05, the Court finds that the ALJ appears to have placed improper weight on this type of evidence and failed to consider the possibility that Claimant might have met the diagnostic definition of mental retardation in spite of her history of functionality.

Finally, the Court acknowledges that Claimant has attempted to argue on appeal that "a deficit in adaptive functioning . . . is sufficiently shown where a claimant struggles through special education classes and then drops out in the 9th grade after becoming pregnant," by citing two Eighth Circuit cases. Cl.'s Mem. at 2-3; *see also Maresh v. Barnhart*, 438 F.3d 897 (8th Cir. 2006); *Christner v. Astrue*, 498 F.3d 790 (8th Cir. 2007). In response, the Commissioner distinguishes Claimant's proffered cases, arguing not only that neither case holds as Claimant suggests but that, moreover, neither case *could* conceivably contain such a holding given the fact that both involved male claimants. Comm.'s Mem. at 13. The Court finds that the ALJ's conclusion that Claimant left school due to her pregnancy, and not her poor performance in special education, was supported by specific evidence in the record (R. 315), and Claimant does not dispute this conclusion. *See* Cl.'s

Mem. at 2-3. However, the Court finds that *Maresh* and *Christner* do not hold as Claimant suggests[5] and is inclined to agree with the Commissioner's position that, "[w]hile getting pregnant at such a young age is, undoubtedly, irresponsible, it is hardly reflective of mental retardation." Comm.'s Mem. at 12-14. Therefore, the Court is of the mind that Claimant's pregnancy adds nothing to her argument that she suffered from deficits in adaptive functioning. Yet, as previously discussed, this does not detract from the ALJ's failure to discuss Claimant's history of poor performance in special education, and accordingly, does not operate to alter the Court's recommendation regarding Claimant's motion for judgment on the pleadings.

In sum, it is not evident from the ALJ's decision whether the ALJ analyzed all of the relevant evidence in considering whether Claimant had satisfied the diagnostic definition of mental retardation. The ALJ clearly considered the issue generally, and did use the appropriate language in concluding that Claimant "does not have a history of deficits in adaptive functioning." (R. 15.) However, particularly given errors such as the ALJ's failure to properly analyze Claimant's history of poor performance in special education, explore the potential existence of other deficits in adaptive functioning manifesting before age 22, or mention Dr. Michael's diagnosis of Claimant as mildly retarded, the Court cannot say with certainty that the ALJ's decision was supported by substantial evidence. *See DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983) ("It may be . . . that the ALJ considered all of these factors and proposed to [her]self cogent reasons for disregarding them. However, on this record, we cannot so determine."). It is, of course, entirely possible, if not likely,

_____

[5] Both *Maresh* and *Christner* involved claimants that dropped out of school after struggling in special education. However, as the Commissioner points out, both claimants were male and thus, pregnancy was not a factor. Furthermore, both records contained clear evidence that the claimants suffered from deficits in adaptive functioning in other, non-academic, areas, making them further inapposite to the case at hand.

that the ALJ reached the proper conclusion as to whether Claimant satisfied the diagnostic definition of mental retardation. However, nonetheless, given the ALJ's failure to sufficiently explain her findings and rationale, the undersigned recommends that this case be remanded so that the Commissioner can perform a proper analysis of whether Claimant has satisfied the diagnostic definition of mental retardation and explain on the record how the evidence as a whole supports her decision.

Even though the undersigned recommends remand of this case based on Claimant's first argument, Claimant's additional two arguments will be briefly addressed at this time. The Court finds both of them to be without merit, and thus, does not recommend that they be reconsidered on remand.

**B.** **Claimant's argument that the ALJ erred by failing to specify in the hypothetical question that she required an "at will" sit/stand option.**

Claimant next argues that the ALJ erred by failing to specify in the hypothetical question posed to the VE that Claimant required an "at will" sit/stand option. To that end, Claimant contends that Social Security Ruling ("SSR") 96-9p states that "the RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing" and that therefore the ALJ's hypothetical was fatally deficient for merely saying that the hypothetical claimant would require a sit/stand option instead of specifying the frequency of alteration from sitting to standing. Cl.'s Mem. at 4; *see also* SSR 96-9P, 1996 WL 374185, at *7 (S.S.A. July 2, 1996). In response, the Commissioner argues both that the ALJ's actual RFC assessment used the words "at her discretion" and thus comported with the SSR 96-9p requirement, and that, in reading the transcript of the relevant portion of the hearing, it is evident that the VE was not confused and answered the question based

on a hypothetical claimant's need to alternate between sitting and standing "at her own discretion." Comm.'s Mem. at 16.

In finding that Claimant retained the RFC to perform light work with postural, environmental, and mental restrictions, the ALJ specifically considered Claimant's ability to sit/stand, stating that "[s]he requires a work environment which would permit her to change between sitting and standing positions at her discretion." (R. 16.) The Court finds that the Commissioner is correct that the ALJ's RFC assessment clearly indicated the required frequency by using the words "at her discretion" and thus comported with the requirements of SSR 96-9p. In fact, Claimant does not appear to dispute that the ALJ's RFC assessment was in compliance with SSR 96-9p at all, but instead only argues that, because the ALJ did not use similar language when *posing the hypothetical* to the VE, this also would also cause the ALJ to have run afoul of the SSR 96-9p frequency indication requirement.

It is true that, in posing the hypothetical to the VE, the ALJ only specifically requested that the VE consider a "sit/stand option" and not an "at will sit/stand option." (R. 59.) Claimant cites an Eastern District of Wisconsin case in support of the proposition that such an omission would serve to violate the frequency requirement of SSR 96-9p. *Castrejon v. Apfel*, 131 F. Supp. 2d 1053 (E.D. Wis. 2001). In *Castrejon*, the court reasoned that the ALJ's RFC finding "limited the plaintiff to sedentary work with a sit/stand option, but did not specify frequency, which is a crucial component in assessing a claimant's ability to work. Furthermore, the hypothetical to the VE suffer[ed] [from] the same defect." 131 F. Supp. 2d at 1057-58. Though the *Castrejon* court did mention the lack of a frequency indication in the ALJ's hypothetical as problematic, it is clear that this was not the basis of its decision that the ALJ's RFC finding did not comply with SSR 96-9p; rather, the ALJ's failure to mention frequency in the decision was the dispositive factor. Claimant has offered no other

18

authority in support of her contention that SSR 96-9p may be violated by an ALJ's failure to include frequency indication language in a hypothetical and the Court finds no independent basis for ruling that this is a possible error. In addition, the Court agrees with the Commissioner that a careful reading of the relevant portion of the transcript reveals no reason to believe that the VE was confused or operating under any assumption other than the one that a "sit/stand option" would be at the hypothetical claimant's discretion. Claimant has not argued that any such confusion existed or that there was any other impropriety or deficiency in the ALJ's hypothetical question to the VE.

The ALJ properly included frequency indication language in the RFC assessment portion of the decision and whether or not similar frequency language was included in the hypothetical question posed to the VE is of no import. Accordingly, Claimant's argument that the ALJ erred by failing to specify in the hypothetical question that Claimant required an "at will" sit/stand option is rejected.

C.     **Claimant's argument that the ALJ erred as a matter of law by relying on VE testimony that was in unexplained conflict with the Dictionary of Occupational Titles ("DOT").**

Finally, Claimant argues that the ALJ erred as a matter of law by relying on VE testimony that was in unexplained conflict with the Dictionary of Occupational Titles ("DOT"). To that end, Claimant argues that SSR 83-12 establishes a "rebuttable presumption that unskilled jobs which accommodate a sit/stand option do not exist in significant numbers in the national economy," and that, as a result, the VE's testimony that a claimant who required a sit/stand option could do unskilled jobs was necessarily in conflict with the DOT. Cl.'s Mem. at 5. Claimant cites a Ninth Circuit case, *Manes v. Astrue*, 2008 WL 466128 (9th Cir. Feb. 19, 2008), in support of this proposition. In addition, Claimant contends that the ALJ further erred by not eliciting a reasonable explanation for the conflict between the VE's testimony and the DOT, as required by SSR 00-4p. Cl.'s Mem. at 5.

19

Therefore, more specifically, Claimant argues that the ALJ erred by relying on the VE's testimony when the VE did not properly acknowledge that her testimony was contradicted by the DOT and did not overcome the presumption that unskilled jobs which accommodate a sit/stand option do not exist in significant numbers in the national economy.

In response, the Commissioner argues that Claimant has failed to cite any alleged conflict between the VE's testimony and the DOT, but rather cites an alleged conflict between the VE's testimony and SSR 83-12. Furthermore, the Commissioner argues that, regardless, there is no conflict between the VE's testimony and SSR 83-12 because SSR 83-12 allows an ALJ to deal with the issue by consulting a VE to "clarify the implications for the occupational base," and that the ALJ in this case did so. Comm.'s Mem. at 16-17.

At the outset, the Court agrees with the Commissioner's position that Claimant has not cited the existence of any conflict between the VE's testimony and the DOT, as proscribed by SSR 00-4p, and that, instead, Claimant has cited the existence of a conflict between the VE's testimony and SSR 83-12. This, in and of itself, defeats Claimant's argument. However, in the interest of completeness, the Court has briefly considered whether the ALJ erred a matter of law by relying on VE testimony that was in unexplained conflict with SSR 83-12 by treating it as if it were the DOT, and finds that she did not.

SSR 00-4p requires that, "[w]hen there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict . . . [and] the adjudicator will inquire, on the record, as to whether or not there is such consistency." SSR 00-4p, 2000 WL 1898704, at *2 (S.S.A. Dec. 4, 2000). Here, the ALJ specifically asked the VE: "Do you understand if you give us an opinion which conflicts with [the DOT] that you need to advise us

20

of the conflicts and the basis for your opinion?" and received an affirmative answer. (R. 53-54.) The VE did not indicate that any inconsistency was present in her testimony, and therefore, the Court believes that the ALJ satisfied her obligation to inquire as to its existence. Moreover, though SSR 83-12 does establish a presumption that unskilled jobs will not have a sit/stand option, it also states that "[i]n cases of unusual limitation of ability to sit or stand, a [VE] should be consulted to clarify the implications for the occupational base." SSR 83-12, 1983 WL 31253, at *4 (S.S.A. 1983). The Commissioner is correct in stating that "[t]his is precisely what the ALJ did in the present case." Comm.'s Mem. at 17. In addition, the Court notes that the unskilled jobs mentioned by the VE after the ALJ mentioned the need for a sit/stand option were office helper, order caller, and warehouse checker. (R. 59-60.) Employing nothing more than common sense, the Court is inclined to assume that at least some of these could conceivably exist with a sit/stand option. Finally, the Court has considered Claimant's proffered Ninth Circuit case and found it to be unpersuasive.[6]

Accordingly, for the foregoing reasons, Claimant's argument that the ALJ erred as a matter of law by relying on VE testimony that was in unexplained conflict with the DOT is rejected.

## CONCLUSION

The undersigned **RECOMMENDS** that Claimant's motion for judgment on the pleadings [DE-27] be **GRANTED**, that the Commissioner's motion for judgment on the pleadings [DE-29] be

---

[6] In *Manes*, the VE was asked to consider how many of 500 parking lot attendant positions classified as "light" jobs would be suitable for the claimant, who required a sit/stand option. The court found that the VE's vague response that the answer would depend "on the size of the booth, or you know, policy of the employer, or whatever" was not sufficient to overcome a DOT presumption that physical requirements of the job were in excess of those for sedentary work. The court found that the ALJ erred by not further inquiring into this conflict which had been admitted by the VE. *See* 2008 WL 466128, at *1-2. The Court finds that this is distinguishable from a situation where, as here, the VE was required to admit the existence of any conflict and did not.

21

**DENIED**, and that the case be **REMANDED** to the Commissioner for further proceedings consistent with this Memorandum and Recommendation.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have fourteen (14) days from the date of receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

This the 17th day of August, 2011.

_____
DAVID W. DANIEL
UNITED STATES MAGISTRATE JUDGE